PUBLIC VERSION

UNITED STATES INTERNATIONAL TRADE COMMISSION

Washington, D.C.

| In the Matter of | |
|---|---|
| CERTAIN FOAM MASKING TAPE | Inv. No. 337-TA-528 |

ORDER NO. 41: INITIAL DETERMINATION GRANTING COMPLAINANTS'
MOTION FOR SUMMARY DETERMINATION OF VIOLATION OF SECTION 337
AND RECOMMENDED DETERMINATION ON REMEDY AND BONDING

(June 21, 2005)

I.    **Introduction**

On May 26, 2005, Complainants 3M Company, 3M Innovative Properties Company and Jean

Silvestre (collectively "Complainants" or "3M") filed a motion [528-040] for summary

determination of violation of Section 337, existence of a domestic industry, and the issuance of a

general exclusion order. On June 6, 2005 the Commission Investigative Staff ("Staff") filed a

response in support of the motion and request for general exclusion order. Respondent Jevtec, Ltd.

("Jevtec") failed to file a response to the motion.

A.    **Procedural History**

On November 24, 2004, 3M filed a complaint with the Commission pursuant to Section 337

of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337. On December 13, 2004, 3M filed an

amended complaint.   The amended complaint alleges violations of Section 337 by all named

respondents (including Boss Auto Import, S.A.; Chemicar USA, Inc.; EMM America, Inc.; E.M.M.

International B.V.; Indasa, S.A.; Indasa U.S.A., Inc.; Intertape Polymer Corporation; IPG

Administrative Services, Inc.; Intertape Polymer Group, Inc.; Saint-Gobain Abrasifs (France); Saint-

Gobain Abrasives, Inc.; Transtar Autobody Technologies, Inc. and Vosschemic GmbH)  in connection with the importation, sale for importation, and sale within the United States after importation of certain foam masking tape by reason of infringement of claims 1-4, 7-10, 13, 16-21 and 23-24 of U.S. Patent No. 4,996,092 ("the '092 patent") and claims 1, 3, 4, 6-8, 10-11, 13, 14 and 16 of U.S. Patent No. 5,260,097 ("the '097 patent"). On December 28, 2004, the Commission issued a Notice of Investigation that was subsequently published in the Federal Register on January 4, 2005.[1] On January 4, 2005, the undersigned issued Order No. 2, setting a thirteen-month target date of February 6, 2006 for this investigation.

On March 1, 2005, the undersigned issued an initial determination granting 3M's motion to amend the complaint and notice of investigation to add two additional respondents to the investigation, including Jevtec, Ltd. and Continental Marketing International. *See* Order No. 14.  On March 29, 2005, the Commission issued a Notice of its decision not to review the initial determination.

On March 1, 2005, the undersigned issued an initial determination terminating the investigation as to Respondent Chemicar USA, Inc. based on a settlement agreement and a consent order.  *See* Order No. 10. On March 31, 2005, the Commission issued a notice of decision not to review the initial determination.

On March 1, 2005, the undersigned issued an initial determination terminating the investigation as to Respondent E.M.M. International B.V. based on a consent order.  *See* Order No. 11. On March 31, 2005, the Commission issued a notice of decision not to review the initial determination.

---

[1]     *See* 70 Fed. Reg. 386 (January 4, 2005).

On March 1, 2005, the undersigned issued an initial determination terminating the investigation as to Respondent EMM America, Inc. based on a settlement agreement and consent order. *See* Order No. 12. On March 31, 2005, the Commission issued a notice of decision not to review the initial determination.

On March 1, 2005, the undersigned issued an initial determination terminating the investigation as to Respondents Indasa, S.A. and Indasa U.S.A., Inc. based on a settlement agreement and consent order. *See* Order No. 13. On March 31, 2005, the Commission issued a notice of decision not to review the initial determination.

On March 7, 2005, the undersigned issued an initial determination terminating the investigation as to Respondent Vosschemie GmbH based on a consent order. *See* Order No. 17. On April 4, 2005, the Commission issued a notice of decision not to review the initial determination.

On March 7, 2005, the undersigned issued an initial determination terminating the investigation as to Respondent Transtar Autobody Technologies, Inc. based on a settlement agreement and consent order. *See* Order No. 18. On April 4, 2005, the Commission issued a notice of decision not to review the initial determination.

On March 24, 2005, the undersigned issued an initial determination terminating the investigation as to Respondents Saint-Gobain Abrasifs (France) and Saint-Gobain Abrasives, Inc. based on a settlement agreement and consent order. *See* Order No. 21. On April 19, 2005, the Commission issued a notice of decision not to review the initial determination.

On May 10, 2005, the undersigned issued an initial determination terminating the investigation as to Respondents Intertape Polymer Corporation; IPG Administrative Services, Inc.; and Intertape Polymer Group, Inc. based on a consent order. *See* Order No. 27. On May 26, 2005,

the Commission issued a notice of decision not to review the initial determination.

On May 24, 2005, the undersigned issued an initial determination terminating the investigation as to Respondent Boss Auto Import, S.A. based on a consent order. *See* Order No. 29. On June 10, 2005 the Commission issued a notice of decision not to review the initial determination.

On May 24, 2005, the undersigned issued an initial determination terminating the investigation as to Respondent Continental Marketing International based on a consent order. *See* Order No. 34. On June 10, 2005 the Commission issued a notice of decision not to review the initial determination.

On June 15, 2005, the undersigned issued an initial determination finding Respondent Jevtec, Ltd. in default. *See* Order No. 39.

### B.    Parties

3M Company is a Delaware corporation with its principal place of business located at 3M Center, St. Paul, Minnesota. 3M Innovative Properties Co. is a Delaware corporation having a principal place of business located at 3M Center, St. Paul, Minnesota. 3M Innovative Properties Co. manages, holds and licenses intellectual property and is the assignee of 3M's license rights under the '097 patent. 3M is the exclusive, worldwide licensee of the '097 patent. Jean Silvestre lives in Belgium. He is the inventor and owner of the '097 patent.

Jevtec is a corporation organized under the laws of the United Kingdom with its principal place of business located at Unit 3, Cranage Trading Park, Goostrey Lane, Holmes Chapel, Cheshire, CW4 8HE, United Kingdom.

### C.    Patents at Issue

The '097 patent is entitled "Method for Masking a Surface by Adhesive Application of an

-4-

Elongated, Compressible, Windowless Cushion" which issued on November 9, 1993, based on application no. 964,464, filed on October 21, 1992, which is a continuation of application serial no. 700,888, May 10, 1991, abandoned, which is a continuation of application serial no. 411,377, September 22, 1989, abandoned. The named inventor is Jean Silvestre. 3M Innovative Properties Co. is the assignee of 3M's license rights under the '097 patent. The '097 patent has a total of 16 claims. One independent claim, claim 1, is at issue here. Also at issue are dependent claims 7, 8, 10, 11, 13, 14 and 16.

In addition, two reexamination certificates were issued for the '097 patent. The first reexamination certificate issued on April 17, 2001. The first reexamination certificate canceled claims 2, 5, 9 and 15, while claims 1 and 4 were amended. The second reexamination certificate issued on August 17, 2004. The second reexamination certificate confirmed the patentability of claims 1, 3, 7, 8, 10-14 and 16 and amended claims 4 and 6.

The '092 patent is no longer at issue in this investigation as all Respondents charged with infringement of the '092 patent have been terminated from this investigation.

### D.    Products at Issue

3M introduced its first foam masking tape in the United States, including instructions teaching the Silvestre method, in 1991. The foam masking tape product made by 3M and used by its customers in accordance with the claims of the '097 patent is sold under the name "3M Soft Edge Foam Masking Tape" ("SEFMT"). Since 1991, 3M has sold [          ] of dollars of SEFMT.

Jevtec's manufactures foam masking tape in the [                    ], which is imported and sold in the United States under the name [                    ] Jevtec first offered [          ] for sale in the United States on [                    ].

-5-

## II.    Summary Determination Standard

Pursuant to Commission Rule 210.18, summary determination "... shall be rendered if pleadings and any depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary determination as a matter of law."[2]

"When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor."[3] The trier of fact should "assure itself that there is no reasonable version of the facts, on the summary judgment record, whereby the nonmovant could prevail, recognizing that the purpose of summary judgment is not to deprive a litigant of a fair hearing, but to avoid an unnecessary trial."[4] "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate."[5] "In other words, '[s]ummary judgment is authorized when it is quite clear what the truth is,' [citations omitted], and the law requires judgment in favor of the movant based upon facts not in genuine dispute."[6]

Commission Rule 210.18(c) requires a party opposing a summary determination motion to set forth specific facts and supporting evidence showing that a genuine issue of fact for the evidentiary hearing exists. No responses in opposition to the summary determination motion have

---

[2]    19 C.F.R. § 210.18(b); *also see DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1322 (Fed. Cir. 2001); *Wenger Mfg., Inc. v. Coating Machinery Systems, Inc.*, 239 F.3d 1225, 1231 (Fed. Cir. 2001).

[3]    *Xerox Corp. v. 3Com Corp.*, 267 F.3d 1361, 1364 (Fed.Cir. 2001).

[4]    *EMI Group North America, Inc. v. Intel Corp.*, 157 F.3d 887, 891 (Fed. Cir. 1998).

[5]    *Sandt Technology, Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1357 (Fed.Cir. 2001) (Dyk, C.J., concurring).

[6]    *Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.*, 984 F.2d 1182, 1185 (Fed. Cir. 1993).

been received as of this date.  Therefore, none of the factual assertions made in the summary

determination motion have been contested and they will be accepted as alleged.

## III.    Jurisdiction and Importation

Section 337 confers subject matter jurisdiction on the International Trade Commission to

investigate, and if appropriate, to provide a remedy for, unfair acts and unfair methods of

competition in the importation of articles into the United States.[7]  In order to have the power to

decide a case, a court or agency must have both subject matter jurisdiction, and jurisdiction over

either the parties or the property involved.[8]

In *Certain Trolley Wheel Assemblies*,[9] the Commission stated that the number of accused

articles that are imported by a respondent is irrelevant to the issue of whether the Commission has

jurisdiction over the respondent's alleged unfair acts.[10] Therefore, the Commission has jurisdiction

over a respondent who, for the purpose of taking sales orders, had imported only one article which

was of no commercial value.[11]

Jevtec, through its discovery responses, has admitted that it [


]. In addition, Jevtec, [

] who sell foam masking tape in the United Stated under the name

---

[7]    19 U.S.C. § 1337; *also see Certain Steel Rod Treating Apparatus and Components Thereof,* Inv. No. 337-TA-97, Commission Memorandum Opinion, 215 U.S.P.Q. 229, 231 (1981) ("*Steel Rod*").

[8]    *Id.*

[9]    *Certain Trolley Wheel Assemblies*, Inv. No. 337-TA-161 (Commission Opinion 1984).

[10]    *Certain Trolley Wheel Assemblies*, Inv. No. 337-TA-161, Commission Opinion at 8 (1984).

[11]    *Certain Trolley Wheel Assemblies*, Inv. No. 337-TA-161, Commission Opinion at 8 (1984).

[          ] Accordingly, the importation requirement has been satisfied.

The power of the Commission to issue a remedy in a Section 337 investigation is based on its *in rem* jurisdiction over the property involved. Thus, the remedy operates against property, not against parties.[12] As a result, it is not necessary for the Commission to have *in personam* jurisdiction over a party to name them as a respondent or to adversely affect their interest in the property under dispute.[13]

Although the Commission may act on the strength of its *in rem* jurisdiction in the absence of *in personam* jurisdiction, due process requires that it provide notice to persons with an interest in property reasonably calculated to inform them of the pendency of an action affecting that property so that they may have the opportunity to appear and defend their interests.[14] Thus, service of the complaint and notice of investigation by the Commission on a named foreign respondent may not necessarily be an assertion of personal jurisdiction over that party, but will satisfy the due process requirement of reasonable notice to support *in rem* jurisdiction.[15]

A finding of personal jurisdiction over a foreign respondent who does not participate in a Section 337 proceeding may be based on evidence that the respondent has minimum contacts with the United States and that the respondent had adequate notice of the Commission's proceeding. As to minimum contacts, 3M offers evidence that Jevtec has exported to the United States the accused foam masking tape after the issuance of the '097 patent. Accordingly, there is evidence that supports

---

[12]    *Sealed Air Corp. v. U.S. Int'l Trade Comm'n*, 209 U.S.P.Q. 469 (C.C.P.A. 1981) ("*Sealed Air*").

[13]    *Steel Rod*, 215 U.S.P.Q. at 232; *see also In re Orion*, 21 U.S.P.Q. 563, 571 (C.C.P.A. 1934) ("*Orion*").

[14]     *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ("*Mullane*").

[15]     *Steel Rod*, 215 U.S.P.Q. at 231.

a finding that Jevtec has minimum contacts with the United States.

In this investigation, the Commission Secretary served the complaint and notice of investigation on all respondents, and there is sufficient proof on this record to establish that all respondents received notice of this investigation. With respect to respondent Jevtec, although the Commission did not receive a return receipt or a written response to the complaint, the complaint and notice that were served by mail were not returned to the Commission. In view of the fact that Jevtec has submitted certain pleadings to the undersigned and participated in some discovery during the course of this investigation, the undersigned finds that Jevtec has received notice of this investigation. On the basis of the facts of record, the undersigned finds that the Commission has personal jurisdiction over Jevtec in the investigation.

For the foregoing reasons, the undersigned finds that the Commission has jurisdiction over the subject matter of this investigation, *in rem* jurisdiction over the product at issue, and personal jurisdiction over the respondents named in this investigation.

## IV.    Claim Construction

### A.    Relevant Law

Analyzing whether a patent is infringed "entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device or process accused of infringing."[16] The first step is a question of law, whereas the second step is a factual determination.[17] To prevail, the patentee must

---

[16]    *Dow Chem. Co. v. United States*, 226 F.3d 1334, 1338 (Fed. Cir. 2000) ("*Dow Chemical*"), *citing Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) ("*Markman*").
[17]    *Markman, supra.*

establish by a preponderance of the evidence that the accused device infringes one or more claims

of the patent either literally or under the doctrine of equivalents.[18]

**B.    Asserted Claims**

Claims 1, 7, 8, 10, 11, 13, 14 and 16 are asserted as follows:

Claim 1:    A method for masking at least part of a surface to be treated, comprising applying to the at least part of the surface to be treated by way of an adhesive an elongated compressible windowless cushion that is resistant to the treatment, and removing the cushion after the treatment wherein the cushion is absorbent.

Claim 7:    The method of claim 1 wherein the at least part of the surface is a space in a vehicle body between an element attached to the vehicle body and part of the vehicle body adjacent the element.

Claim 8:    The method of claim 1 wherein the at least part of the surface to be treated is at least part of an irregularity on the surface to be treated.

Claim 10:    The method of claim 8 wherein the cushion is adapted to the irregularity in such a manner as to at least substantially bridge the irregularity.

Claim 11:    The method of claim 8 wherein the irregularity is formed by a weather strip applied to a vehicle body and the cushion is repositionably adhered to at least part of the weather strip to mask the weather strip.

Claim 13:    The method of claim 1 wherein the surface to be treated is a vehicle body and the cushion is applied to the at least part of the surface to be treated so as to mask an opening in the vehicle body between a door, a hood, or a hatch and the vehicle body adjacent the door, hood, or hatch.

Claim 14:    The method of claim 13 wherein the cushion is applied in such a manner so as to intersect the plane of the at least part of the surface to be treated.

Claim 16:    The method of claim 1 wherein the treatment is painting.

According to 3M and the Staff, it appears that the only claim term contested by Jevtec is

"applying to the at least part of the surface to be treated," which is based on Jevtec's response to an

---

[18]    *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir.), *cert. denied*, 531 U.S. 993 (2000) ("*Bayer*").

interrogatory regarding infringement. 3M construes the term as "plac[ing] the cushion [or foam masking tape] so that it occupies a position at the outer boundary of the body being treated." Jevtec, through its interrogatory responses, expert report of David McNeight (which was stricken by Order No. 35), and motion for summary judgment (which was not considered because it was improperly filed; *see* notice issued on May 26, 2005)[19] appears to argue that where the adhesive portion of a foam masking tape is placed in contact with a surface that is not to be painted, such as the frame of a door, the foam masking tape is not applied to the "at least part of a surface to be treated." Jevtec's claim construction attempts to make a distinction between surface areas of the vehicle that are treated with paint, such as the door surround, and the areas of the vehicle that are not treated with paint, such as the inner edge of the door.

3M argues that the '097 patent does not require that the adhesive portion of the tape be in contact with the surface to be treated. In support, 3M points to Figure 4 of the '097 patent which shows that the adhesive portion of the preferred embodiment is positioned so as to fill the gap adjacent to the door of the automobile and is not in contact with the surface to be treated. Rather, the adhesive in Figure 4 contacts a portion of the car interior to the surface.

3M argues that the term "surface" includes gaps and other irregularities found at the exterior of an automobile. Claim 7 provides that "surface" includes "a space in a vehicle body between an element attached to the vehicle body and part of the vehicle body adjacent the element" and claim 8 provides that "part of the surface to be treated is at least part of an irregularity on the surface to be treated." The Staff agrees that there is no limitation in claim 1 that restricts the work "surface" to

---

[19]     Although the undersigned has stricken Mr. McNeight's expert report and motion for summary judgment, the undersigned addresses the arguments raised therein to give full consideration to Jevtec's position.

any one surface are of the vehicle.

It appears that Jevtec's claim construction is based on the instructions accompanying its foam masking tape, which teaches one to adhere the tape to the inside edge of an open car door so that it extends beyond the edge of the door, then close the door so that the foam masking tape protrudes from the gap. The packaging also teaches one to adjust the foam masking tap manually to the same level as the car door and exterior. According to Jevtec, under its claim construction, the method taught by Figure 4 does not practice the method in claim 1.

It is well established that claim construction that excludes a preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support.[20] As Jevtec's alleged claim construction excludes the preferred embodiment, it is hereby rejected. In addition, the claim construction proposed by 3M and the Staff is consistent with the claim's plain and ordinary meaning. Accordingly, the term "applying to the at least part of a surface to be treated" is construed as "placing the foam masking tape so that it occupies a position at the outer boundary of the body being treated."

## V.     Infringement

### A.     Relevant Law

Literal infringement is a question of fact.[21] Literal infringement requires the patentee to prove that the accused device contains each limitation of the asserted claim(s). Each element of a claim is considered material and essential, and in order to show literal infringement, every element must be found to be present in the accused device.[22] If any claim limitation is absent from the

---

[20]     *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

[21]     *Tegal Corp. v. Tokyo Electron America, Inc.*, 257 F.3d 1331, 1350 (Fed. Cir. 2001) ("*Tegal Corp.*"), *cert. denied*, 535 U.S. 927 (2002).

[22]     *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991).

-12-

accused device, there is no literal infringement of that claim as a matter of law.[23]  In addition, direct evidence of direct infringement is unnecessary where circumstantial evidence indicates that direct infringement occurs.[24]

Both contributory and induced infringement require the complainant to prove an act of direct infringement.[25]  Under 35 U.S.C. § 271(c):

> Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.[26]

Contributory infringement cannot be successfully asserted without a showing of direct infringement.[27]

Section 271(b) of the patent statute provides that one who "actively induces infringement of a patent shall be liable as an infringer."[28]  The Commission has found that induced infringement is established when a party shows (1) the conduct being induced constitutes direct infringement, (2) the respondent actively and knowingly aided and abetted another's direct infringement of the patent, and (3) the accused infringer knew or should have known that his actions would induce

---

[23]     *Bayer*, 212 F.3d at 1247.

[24]     *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261,1272 (Fed. Cir. 1986).

[25]     *Serrano et al. v. Telular Corp.*, 111 F.3d 1578, 1583 (Fed. Cir. 1997);  *Certain Flash Memory Circuits and Products Containing Same*, Inv. No. 337-TA-382, Commission Opinion on the Issues Under Review and on Remedy, the Public Interest, and Bonding at 16 (U.S.I.T.C., July 1997).

[26]     19 U.S.C.A. § 271(c) (1996 Supp.), *see Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176 (1980).

[27]     *Porter v. Farmer's Supply Serv., Inc.*, 790 F.2d 882 (Fed. Cir. 1986).

[28]     35 U.S.C. § 271(b).

infringement.[29]

**B.    Infringement**

3M accuses Jevtec of direct infringement, inducement to infringe, and contributory infringement and relies on declarations and expert reports from its two experts, Dr. Colton and Mr. Siewart. According to Mr. Siewert, "[o]ne of ordinary skill in automobile painting would use DM-37 ShieldFast™ to mask the gaps of an automobile prior to painting." And according to Dr. Colton, one using the accused product in the method taught by the instructions on the box of the product would be practicing the asserted claims. In addition, Jevtec's United States distributor,[

] admits the use of [                            ] in the United States in 2005 for this purpose. Jevtec's United States distributor also states that Jevtec provides the [

] which aids and abets direct infringement by others.

Jevtec allegedly asserts that in its method, "the tape is applied not to the surface to be *treated*, rather to a part of the surface that is *not* to be treated. The tape is applied to the inner edge of the door (or other moving member), rather than to the door surround. The surface to be treated is the outside of the door and the door surround."[30] Given the undersigned's above claim construction, Jevtec's infringement analysis must fail and is rejected.

Accordingly, 3M, by its experts, has demonstrated that there is direct infringement of the asserted claims of the '097 patent by one using Jevtec's product in its intended manner. 3M has also shown that Jevtec induces infringement, as Jevtec has admitted its knowledge of the '097 patent as

---

[29]    *Flash Memory*, at 16, *citing Manville Sales Corp. v. Paramount Sys. Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990). *See also Certain Headboxes and Papermaking Machine Forming Sections for the Continuous Production of Paper, and Components Thereof*, Inv. No. 337-TA-82, USITC Pub. No. 1138 at 18- 19 (1981).
[30]    *See* McNeight Expert Report at 6 (emphasis in original).

early as [                    ] through its discovery responses, and that it actively and knowingly aids

direct infringement by an end user. 3M has also shown that Jevtec contributes to infringement as

there is evidence that Jevtec imports the accused product for sale, that the accused product is material

to the invention, that Jevtec knows that [                    ] is used to practice the '097 patent and

that there are no non-infringing uses of Jevtec's foam masking tape.

## VI.     Domestic Industry

### A.     Relevant Law

In a patent-based complaint, a violation of Section 337 can be found "only if an industry in

the United States, relating to the articles protected by the patent . . . concerned, exists or is in the

process of being established."[31] This "domestic industry requirement" has an "economic" prong and

a "technical" prong.

A complainant in a patent-based Section 337 investigation must demonstrate that it is

practicing or exploiting the patents at issue.[32] In order to find the existence of a domestic industry

exploiting a patent at issue, it is sufficient to show that the domestic industry practices any claim of

that patent, not necessarily an asserted claim of that patent.[33] Fulfillment of this so-called "technical

prong" of the domestic industry requirement is not determined by a rigid formula, but rather by the

---

[31]     19 U.S.C. § 1337(a)(2).

[32]     *See* 19 U.S.C. § 1337(a)(2) and (3); *also see Certain Microsphere Adhesives, Process for Making Same, and Products Containing Same, Including Self-Stick Repositionable Notes,* Inv. No. 337-TA-366, Commission Opinion at 8, 1996 WL 1056095 (U.S.I.T.C., January 16, 1996) ("*Microsphere Adhesives*"), *aff'd sub nom. Minnesota Mining & Mfg. Co. v. U.S. Int'l Trade Comm'n,* 91 F.3d 171 (Fed. Cir. 1996) (Table); *Certain Plastic Encapsulated Integrated Circuits,* Inv. No. 337-TA-315, U.S.I.T.C. Pub. No. 2574 (November 1992), Commission Opinion at 16, 1992 WL 813959 ("*Encapsulated Circuits*").

[33]     *Microsphere Adhesives,* Commission Opinion at 7-16.

articles of commerce and the realities of the marketplace.[34]

The test for claim coverage for the purposes of the technical prong of the domestic industry requirement is the same as that for infringement.[35] "First, the claims of the patent are construed. Second, the complainant's article or process is examined to determine whether it falls within the scope of the claims."[36] As with infringement, the first step of claim construction is a question of law, whereas the second step of comparing the article to the claims is a factual determination.[37] To prevail, the patentee must establish by a preponderance of the evidence that the domestic product practices one or more claims of the patent either literally or under the doctrine of equivalents.[38]

The term "domestic industry" in Section 337 is not defined by the statute, but the Commission has interpreted the intent of Section 337 to be "the protection of domestic manufacture of goods."[39] The Commission has further stated that "[t]he scope of the domestic industry in patent-based investigations has been determined on a case by case basis in light of the realities of the marketplace and encompasses not only the manufacturing operations but may include, in addition, distribution, research and development and sales."[40]

---

[34]    *Certain Diltiazem Hydrochloride and Diltiazem Preparations*, Inv. No. 337-TA-349, U.S.I.T.C. Pub. No. 2902, Initial Determination at 138, 1995 WL 945191 (U.S.I.T.C., February 1, 1995) (unreviewed in relevant part) ("*Diltiazem*"); *Certain Double-Sided Floppy Disk Drives and Components Thereof*, Inv. No. 337-TA-215, 227 U.S.P.Q. 982, 989 (Commission Opinion 1985) ("*Floppy Disk Drives*").

[35]    *Certain Doxorubicin and Preparations Containing Same*, Inv. No. 337-TA-300, Initial Determination at 109, 1990 WL 710463 (U.S.I.T.C., May 21, 1990) ("*Doxorubicin*"), aff'd, Views of the Commission at 22 (October 31, 1990).

[36]    *Id.*

[37]    *Markman,* 52 F.3d at 976.

[38]    *See Bayer,* 212 F.3d at 1247.

[39]    *Certain Dynamic Random Access Memories, Components Thereof and Products Containing Same*, Inv. No. 337-TA-242, U.S.I.T.C. Pub. No. 2034 (November 1987), Commission Opinion at 61, 1987 WL 450856 (U.S.I.T.C., September 21, 1987).

[40]    *Id.* at 62 (footnotes omitted).

In making this determination, Section 337(a)(2) provides that for investigations based on patent infringement, a violation can be found "only if an industry in the United States, relating to the articles protected by the patent . . . concerned, exists or is in the process of being established."[41] Section 337(a)(3) sets forth the following economic criteria for determining the existence of a domestic industry in such investigations:

> an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the . . . patent . . . concerned –
>
> > (A) significant investment in plant and equipment;
> >
> > (B) significant employment of labor or capital; or
> >
> > (C) substantial investment in its exploitation, including engineering, research and development, or licensing.[42]

As the statute uses the disjunctive term "or," a complainant can demonstrate this so-called "economic prong" of the domestic industry requirement by satisfying any one of the three tests set forth in Section 337(a)(3).[43] The complainant bears the burden of establishing that the domestic industry requirement is satisfied.[44]

### B.    Domestic Industry

3M argues that undisputed facts demonstrate that its economic activities meet all the criteria of 337(a)(3)(A) and (B) for establishment of a domestic industry and that its SEFMT product

---

[41]    19 U.S.C. § 1337(a)(2).
[42]    19 U.S.C. § 1337(a)(3).
[43]    *See Certain Plastic Encapsulated Integrated Circuits*, Inv. No. 337-TA-315, U.S.I.T.C. Pub. No. 2574 (November 1992), Initial Determination at 83, 1992 WL 813952 (U.S.I.T.C., October 16, 1991) (unreviewed by Commission in relevant part).
[44]    *See Certain Set-top Boxes and Components Thereof*, Inv. No. 337-TA-454, U.S.I.T.C. Pub. No. 3564 (November 2002), Initial Determination at 294, 2002 WL 31556392 (U.S.I.T.C., June 21, 2002), *unreviewed by Commission in relevant part*, Commission Opinion at 2 (August 29, 2002).

practices the '097 patent. As to the economic prong, 3M asserts that it produces SEFMT in the United States at a manufacturing facility in [                    ]. Approximately [

] of the facility is dedicated to the manufacture of the SEFMT, while [                    ] is dedicated to storage of the SEFMT. The acquisition cost for the equipment dedicated to the manufacture of the foam tape product is approximately [                    ] Approximately [    ] employees, with wages of over [        ] are on the SEFMT production line. Based on the evidence presented, 3M has satisfied the economic prong of the domestic industry requirement under 337(a)(3)(A) and (B).

As to the technical prong, 3M relies on its expert, Dr. Colton, that one using 3M's SEFMT in the manner taught by the text and illustrations found on the exterior of the box would practice the asserted claims. 3M's intended customers are auto body shops whose technicians utilize the 3M SEFMT in the manner depicted on the packaging, where the packaging depicts the method of the '097 patent for which 3M is the exclusive licensee. Any auto body shop that purchases the 3M SEFMT manufactured by 3M and follows the depicted instructions are impliedly licensed to use the 3M product to practice the method claimed in the '097 patent.[45] 3M's other expert, Mr. Siewart, states that he has observed 3M's SEFMT product being used in the field. And Jevtec's United States distributor has testified that auto-body shops use 3M's SEFMT in the United States. Based on the evidence presented, 3M has satisfied the technical prong of the domestic industry requirement.

VII.    Validity

The patent at issue is presumed valid by law.[46] Moreover, no party has challenged the

---

[45]    *See Certain Integrated Repeaters*, Inv. No. 337-TA-435, Final Initial and Recommended Determination (July 19, 2001) at 190.

[46]    35 U.S.C. § 282.

validity or enforceability of the '097 patent; therefore, validity and enforceability are not in issue.[47]

## VIII.   Remedy and Bonding

### A.    General Exclusion Order

3M argues that it is entitled to a general exclusion order.  Under section 337(d), the Commission may issue a limited or a general exclusion order.  A limited exclusion order instructs the U.S. Customs Service to exclude from entry all articles that are covered by the patent at issue and that originate from a named respondent in the investigation.  A general exclusion order instructs the U.S. Customs Service to exclude from entry all articles that are covered by the patent at issue, without regard to source. 3M seeks the entry of a permanent general exclusion order.

The issue of whether a general exclusion order should be found under section 337(g)(2) or section 337(d)(2) when there are defaulting respondents was clarified in the Commission's opinion on remedy, the public interest, and bonding in *Certain Sildenafil or any Pharmaceutically Acceptable Salt Thereof*, Inv. 337-TA-489 (February 6, 2004). The Commission stated that

> We find that the issuance of a general exclusion order in the circumstances of this case is not governed by section 337(g)(2), since that provision expressly requires that no respondent appear to contest the investigation and it is clear that respondents Ezee and Biovea did. That no discovery may have been taken from those two respondents prior to action on their termination from the investigation does not change the fact of their appearance to contest the investigation. Section 337(g)(2) therefore cannot apply, and the proper legal framework is section 337(d)(2). However, the non-applicability of section 337(g)(2) does not affect the standard for finding a violation of section 337. This is because the adjudicative provisions of the Administrative Procedures Act, which apply to section 337 investigations, provide that a sanction or order may not be issued unless supported by "reliable, probative, and substantial evidence." 5 U.S.C. § 556.   Thus a violation of section 337 may not be found

---

[47]      *Lannom Mfg. Co., Inc. v. U.S. Int'l Trade Comm'n*, 799 F.2d 1572 (Fed. Cir. 1986).

unless supported by "reliable, probative, and substantial evidence." We see no difference between this standard and the "substantial, reliable, and probative evidence" standard of section 337(g)(2). The additional criteria of section 337(d)(2) for issuance of a general exclusion order apply in both instances. [48]

Accordingly, the undersigned's analysis is under section 337(d)(2).

Section 337(d)(2) authorizes the Commission to issue a general exclusion order if it determines that: (A) a general exclusion from entry of articles is necessary to prevent circumvention of an exclusion order limited to products of named persons; or (B) there is a pattern of violation of this section and it is difficult to identify the source of infringing products. The Commission has held that those standards are, for all intents and purposes, the same as those that the Commission articulated, prior to the enactment of the current version of Section 337(d)(2), in *Certain Airless Paint Spray Pumps*.[49] In *Spray Pumps*, the Commission held that for issuance of a general exclusion order a complainant must establish: (1) a widespread pattern of unauthorized use of the patented invention and (2) that business conditions exist from which one might reasonably infer that foreign manufacturers other than the respondents to the investigation may attempt to enter the U.S. market with infringing articles.[50]

With respect to the "widespread pattern" of unauthorized use, the Commission stated that such a pattern could be demonstrated by: (1) a Commission determination of unauthorized importation of the infringing article into the United States by numerous foreign manufacturers; or (2) the pendency of foreign infringement suits based on foreign patents corresponding to the U.S.

---

[48]     Commission's Order at 4-5.

[49]     *Certain Neodymium-Iron-Boron Magnets, Magnet Alloys*, Inv. No. 337-TA-372, Comm'n Op. at 5-6, USITC Pub 2964 (May 1996); *Certain Airless Paint Spray Pumps*, Inv. 337-TA-90, Comm'n Op., USITC Pub 1199 (November 1981).

[50]     *Spray Pumps*, Comm'n Op. at 18-19.

patent; or (3) other evidence which demonstrates a history of unauthorized foreign use of the patented invention.[51] With respect to the "business conditions" prong, the Commission in Spray Pumps enumerated five factors that are relevant to whether such conditions exist: (1) the existence of an established demand for the article in the U.S. market and conditions of the world market; (2) the availability to foreign manufacturers of U.S. marketing and distribution networks; (3) the cost for foreign entrepreneurs whose facilities could be converted to manufacture the patented articles; (4) the number of foreign manufacturers whose facilities could be converted to manufacture the patented article; and (5) the foreign manufacturers cost to convert a facility to produce the patented articles.[52] In assessing whether a complainant can establish that there is a widespread pattern of unauthorized use, it is important to note that a formal finding of infringement by foreign companies other than the respondents need not be established. Instead, evidence that certain foreign-made products may infringe appears sufficient.[53] The Commission has also stated that the "business conditions" factor strongly favors the issuance of a general exclusion order when "the technology is well known and the manufacturing process is relatively simple, [and the] costs of starting production from scratch are minimal."[54]

In this investigation, evidence of widespread unauthorized use of the asserted patents consists of the following. 3M initially named twelve respondents, which included infringers for which there was clear evidence of importation. 3M then named two additional respondents when their identity

---

[51]    *Id.*

[52]    *Spray Pumps*, Comm'n Op. at 19.

[53]    *Certain Chemiluminescent Compositions and Components Thereof and Methods of Using, and Products Incorporating, the Same*, Inv. No. 337-TA-285, Comm'n Op., USITC Pub. 2370 (1991) (Commission issued a general exclusion order in an investigation where a violation was found against only one respondent).

[54]    *Id.* at 11.

-21-

became known through discovery. The quantity and value of imports by the named respondents in this investigation who have subsequently agreed to cease importing their accused products into the United States clearly demonstrates that there has been substantial unauthorized importation of infringing articles by numerous foreign manufacturers. In addition, with respect to the '097 patent, the evidence shows that Jevtec's products infringe.  Thus, the undersigned finds that 3M has demonstrated that a widespread pattern of unauthorized use by foreign manufacturers and exporters exists.

With respect to the factors considered in assessing whether business conditions are present such that other foreign manufacturers may enter the U.S. market with infringing goods, 3M's revenues from the patented products, which was introduced into the marketplace in 1991, exceeded [          ] in 2004 alone, which indicates that there is an established U.S. market for foam masking tape that practices the patent-at-issue.  Also, marketing and distribution networks to auto body repair shops for infringing products are already widely available in the United States.  In addition, the source of infringing goods is difficult to determine as the infringing goods found to date do not indicate their source and end users are reluctant to reveal such information. For example, the accused foam masking tape manufactured by Respondent Boss Auto has entered the United States under several different brand names, including [

] Moreover, the evidence shows that foreign facilities could modify their operations without incurring substantial expenses to produce infringing products. Thus, the undersigned finds that 3M has demonstrated that business conditions are present such that other foreign manufacturers may enter the U.S. market with infringing goods.  Accordingly, in light of the *Spray Pumps* factors, the undersigned recommends issuance of a general exclusion order for

protecting complainant's intellectual property rights from infringing imports.

**B.    Bond**

Pursuant to Commission rules 210.36(a) and 210.42(a)(1)(ii), the administrative law judge is to issue a recommended determination on bonding since the accused products are entitled to entry under bond during the 60-day Presidential review period.[55] To the extent possible, the bond should be an amount that would be sufficient to protect a complainant from an injury.[56] In setting a bond amount, "the Commission typically has considered the differential in sales price between the patented product made by the domestic industry and the lower price of the infringing imported product."[57] Where the available pricing information is inadequate, however, the bond may be set at 100 percent of the entered value.[58]

3M requests a bond of 100%. The Staff agrees.  In this case, a bond of 100% is appropriate and recommended here.

---

[55]    *See* 19 U.S.C. § 1337(j)(3).
[56]    *See* Commission rule 210.50(a)(3).
[57]    *See, e.g., Microsphere Adhesives*, Comm'n Op. at 24.
[58]    *Id.* at 15.

## IX.  Findings of Fact

As there is no opposition to 3M's statement of material facts, they are hereby adopted as follows:

1.     Respondent Jevtec, Limited ("Jevtec") manufactures and sells foam masking tape to [

] Respondent Jevtec Ltd.'s Response to Complainant 3M's First Set of Interrogatories ("Jevtec's Response"), Response to 3M Interrogatory No. 1; Ex. 4.

2.     Respondent Intertape Polymer Corp. sells [

] Jevtec 's Response to 3M Interrogatory No. 1; Ex. 4.

3.     Jevtec's foam masking tape was [

]. Jevtec's Response to 3M Interrogatory No. 4(b); Ex. 4.

4.     Jevtec identifies [                                    ] among importers of foam masking tape. Jevtec's Response to 3M Interrogatory No. 24; Ex. 4.

5.     [

]. Jevtec's Response to 3M Interrogatory No. 30; Ex. 4.

6.     Respondents Intertape Polymer Corp., IPG Administrative Services Inc. and Intertape Polymer Group, Inc. (collectively "Intertape Respondents") sell foam masking tape in the United States identified as [                    ] Responses of Respondents Intertape Polymer Corporation, IPG Administrative Services Inc. and Intertape Polymer Group, Inc.

-24-

to Complainant 3M Company's First Set of Interrogatories ("Intertape Respondents' Response"), Response to 3M Interrogatory No. 1; Ex. 23.

7.      Beginning in or around [                              ], IPG Administrative Services, Inc. purchased [                              ]. Intertape Respondents' Response to 3M Interrogatory No. 7; Ex. 23.

8.      IPG Administrative Services, Inc.[

                                                              ] the United States. Intertape Respondents' Response to 3M Interrogatory No. 35; Ex. 23.

9.      Intertape Polymer Group is the trademark used by the various related Intertape entities. Intertape Respondents' Response to 3M Interrogatory No. 35; Ex. 23.

10.     [Number not used.]

11.     Intertape Polymer Group has shipped accused product under the product code DM37 in at least [                ]. IP 00838-40; *see* Ex. 5.

11A.    Foam masking tape [                                        ] the United States. Jevtec Limited's Response to Complainant 3M Company's First Set of Requests for Admissions ("Jevtec's Response to RFAs") Response to RFA No. 1 (Ex. 27); *see also* Ex. 26.

11B.    Foam masking tape [                                        ] the United States [                ]. Jevtec's Response to RFA No. 3 (Ex. 27); *see also* Ex. 26.

11C.    Foam masking tape [                                ] the United States. Jevtec's Response to RFA No. 4 (Ex. 27); *see also* Ex. 26.

11D.   Foam masking tape [                                    ] the United States [

].  Jevtec's Response to RFA No. 6 (Ex. 27); *see also* Ex. 26.

12.   United States Patent No. 5,260,097 ("'097 patent") originally issued on November 9, 1993,

to Jean Silvestre.  *See* Exhibit 1.

13.   Complainants' experts, Jonathan S. Colton, Ph.D., P.E. and James Siewert, each timely

served expert reports setting forth their opinions concerning the subject matter of the instant

investigation.  *See* Expert Report of Jonathan S. Colton, Ph.D., P.E., served April 26, 2005,

("Colton Initial Report") (*see* Ex. 8) and Expert Report of James Siewert, served April 26,

2005 ("Siewert's Report") (*see* Ex. 9).

14.   Dr. Colton has been retained by Complainants 3M Company, 3M Innovative Properties

Company and Jean Silvestre to act as an expert witness in the instant investigation.  *See*

Declaration of Jonathan S. Colton in Support of Complainants' Motion for Summary

Determination  ("Colton Decl.") ¶ 1; Ex. 8.

15.   Dr. Colton's background and qualifications are described in his curriculum vita, which is

attached to his expert report (Expert Report attached as Exhibit A to his Declaration).  Colton

Decl. ¶ 1; Ex. 8.

16.   Use of the foam masking tape distributed and sold under the name [                    ]

in the manner taught by the text and photographs found on the exterior of the box in which

it is sold would practice claims 1, 4, 7, 8, 10, 13, 14 and 16 of the '097 patent.  Colton Decl.

¶ 2; Ex. 8.

17.   A person of ordinary skill in the art would construe the term "applying to the at least part of

a surface to be treated" to mean to place the foam masking tape so that it occupies a position

-26-

at the outer boundary of the body being treated.  Colton Decl. ¶ 4; Ex. 4.

18.    Foam masking tape is material to the practice of the method of claims 1, 4, 7, 8, 10, 13, 14 and 16 of the '097 patent.  Colton Decl. ¶ 5; Ex. 8.

19.    There is no substantial use for [                         ] foam masking tape or 3M Soft Edge Foam Masking Tape ("SEFMT") other than to practice the method of claims 1, 4, 7, 8, 10, 13, 14 and 16 of the '097 patent.  Colton Decl. ¶ 6; Ex. 8.

20.    [                         ] foam masking tape is not a staple article of commerce having utility apart from the method of claims 1, 4, 7, 8, 10, 13, 14 and 16 of the '097 patent.  Colton Decl. ¶ 7; Ex. 8.

21.    The "Expert Report of Jonathon S. Colton, Ph.D., P.E.," dated April 26, 2005, is attached to his Declaration as Exhibit A.  Dr. Colton continues to hold the opinions expressed in that expert report.  Colton Decl. ¶ 9; Ex. 8.

22.    Mr. Siewert has been retained by Complainants 3M Company, 3M Innovative Properties Company and Jean Silvestre to act as an expert witness in the instant investigation. Declaration of James Siewert in Support of Complainants' Motion for Summary Determination ("Siewert Decl.") ¶ 1; Ex. 9.

23.    Mr. Siewert has been employed in the auto body repair industry since 1978.  Siewert Decl. ¶ 1; Ex. 9.

24.    A person of ordinary skill in the art would use [                         ] to mask the gaps of an automobile prior to painting.  Siewert Decl. ¶ 2; Ex. 9.

25.    There is no substantial use for [                         ] foam masking tape other than to mask the gaps in automobiles prior to painting.  Siewert Decl. ¶ 4; Ex. 9.

26.    The "Expert Report of James Siewert" is attached to his Declaration as Exhibit A. Mr.
Siewert continues to hold the opinions expressed in that expert report. Siewert Decl. ¶ 7; Ex.
9.

27.    One of ordinary skill in automobile painting would use [                    ] to mask the
gaps of an automobile prior to painting. Siewert Report at 2 (*see* Ex. 9); Deposition of
Thomas Nicolosi taken on April 13, 2005 ("Nicolosi Dep.") at 64:11-15 (Ex. 10).

27A.   [

                         ]. Respondent Intertape Polymer Corp.'s Amended Responses
to Complainant 3M Company's First Set of Requests for Admission ("Intertape Polymer's
RFA Responses"), Response to RFA No. 12; Ex. 28.

27B.   [

                         ]. Intertape Polymer's RFA Responses, Response
to RFA No. 14; Ex. 28.

27C.   [

                         ]. Intertape Polymer's
RFA Responses, Response to RFA No. 16; Ex. 28.

28.    One who uses [                    ] in the method taught by instructions on the box of the
product would practice the asserted claims. Colton Initial Report at 13-15; *see* Ex. 8.

29.    Jevtec manufactures [                ] Jevtec's Response to 3M Interrogatory No. 1;
Ex. 4.

30.    Jevtec [                                                                    ]. Nicolosi

Dep. at 33:16-37:8, 70:24-71:9, 81:16-82:7 (Ex. 10).

31.    [                                        ] in boxes which bear text and photographs that teach

one to practice the '097 patent method of masking.  *See* Ex. 8; Nicolosi Dep. at 36:2-6 (Ex.

10).

32.    Jevtec sells [

].  Jevtec's Responses to 3M Interrogatory Nos. 1 and 7; Ex. 4.

33.    Intertape [

].  *See, e.g.,* Nicolosi Dep. at 56:1-57:3 (Ex. 10).

34.    Intertape Polymer Corp., [

]  *See, e.g.,* Nicolosi Dep. at 29:8-11, 61:11-25

(Ex. 10).

35.    Jevtec had knowledge of the '097 patent [                                        ].

Jevtec's Response to 3M Interrogatory No. 15; Ex. 4.

36.    David L. McNeight was identified by the Intertape Respondents as an expert witness on

March 24, 2005.  Attached as Exhibit F to the identification is the "Resumé of David Leslie

McNeight," dated March 23, 2005.  *See* Identification of Expert Witness of Respondent

Intertape Polymer Corp. and IPG Administrative Services, Inc. attached as Ex. 11.

37.    [                        ] has no substantial noninfringing use.  Nicolosi Dep at 52:16-18 (Ex.

10).

38.    Jevtec [

]  Jevtec's Response to 3M Interrogatory No. 4(e); Ex. 4.

39.    Oliver Jevons [                                    ]. Jevtec's Response to 3M Interrogatory

No. 25; Ex. 4.

39A.   Jevtec was aware of United States Patent No. 5,260,097 [                    ]. Jevtec's

Response to RFA No. 7 (Ex. 27); *see also* Ex. 26.

39B.   Jevtec was aware of United States Patent No. 5,260,097 [                    ]. Jevtec's

Response to RFA No. 8 (Ex. 27); *see also* Ex. 26.

39C.   Jevtec [                                    ] Jevtec's Response

to RFA No. 11 (Ex. 27); *see also* Ex. 26.

39D.   Jevtec [                                ] foam masking tape.  Jevtec's Response to

RFA No. 12 (Ex. 27); *see also* Ex. 26.

39E.   Foam masking tape [                        ] is used to mask gaps in automobiles prior to

painting and is removed after painting.  Jevtec's Response to RFA No. 13 (Ex. 27); *see also*

Ex. 26.

40.    Brent Niccum is the Manufacturing Manager for the SEFMT product line for 3M Company.

Declaration of Brent Niccum attached as Exhibit 38C to the Second Amended Complaint

("Niccum Decl.") ¶ 1; Ex. 12.

41.    3M manufactures SEFMT [                                ].  Niccum Decl. ¶ 4;

Ex. 12.

42.    The total area of 3M's [                            ] dedicated to the manufacture of

SEFMT is approximately [          ] square feet.  Niccum Decl. ¶ 4; Ex. 12.

43.    Approximately [          ] square feet of 3M's [                    ] are dedicated

to storage of SEFMT.  Niccum Decl. ¶ 4; Ex. 12.

44.    Exhibit 22 to the Deposition of Brent Niccum (Apr. 20, 2005) is a layout of 3M's Automotive

Aftermarket Division ("AAD") production area in 3M's [                                    ].

Page 2 of that Exhibit shows the portion of 3M's [                            ] that is

used for SEFMT production. Deposition of Brent Niccum (April 20, 2005) ("Niccum Dep.")

at 108:13-109:5; Ex. 25.

45.    The original equipment used to manufacture 3M's SEFMT was purchased in 1992 at a cost

of approximately [            ]. Niccum Decl. ¶ 5; Ex. 12.

46.    Exhibit 23 to the Niccum Deposition is a report that shows 3M's fixed assets at 3M's

[                                    ] for the AAD Department, including the original

equipment used to manufacture 3M's SEFMT that was purchased in 1992. Niccum Dep. at

111:1-113:6; Ex. 25.

47.    Since 1992, 3M has acquired additional equipment dedicated to the manufacture of SEFMT

at a cost of [            ]. Niccum Decl. ¶ 5; Ex. 12.

48.    Exhibit 24 to the Niccum Deposition is a report showing additional capitalized equipment

acquired since 1992 for the AAD Department at 3M's [                            ],

including additional equipment dedicated to the manufacture of SEFMT. Niccum Dep.

111:1-113:6; Ex. 25.

49.    The total acquisition cost for the equipment dedicated to the manufacture of 3M's SEFMT

is [            ]. Niccum Decl. ¶ 5; Ex. 12.

50.    In November 2004, 3M had [        ] full-time and [        ] temporary employees that rotated

into the [        ] positions on 3M's SEFMT production line. 3M maintained an average of

[        ] operators on the SEFMT production line in 2003 and [        ] operators on the SEFMT

production line in 2004 (YTD through June). Niccum Decl. ¶ 6; Ex. 12.

51.    As of April 2004, 3M had approximately [          ] employees rotating into the [     ]

positions on 3M's SEFMT production line. Niccum Dep. at 101:20–102:8; Ex. 25.

52.    The average number of employees working on 3M's SEFMT production line as of April

2004, did not change. Niccum Dep. at 113:7-17; Ex. 25.

53.    3M expended approximately [          ] in 2002 and approximately [          ] in 2003

for wages and benefit costs related its SEFMT production line. It is estimated that, for 2004,

3M spent approximately [          ] for wages and benefit costs related its SEFMT

production line. Niccum Decl. ¶ 7; Ex. 12.

54.    After the 3M SEFMT is manufactured, [

] Deposition of Jerry Steinke taken on April 21, 2005 ("Steinke

Dep.") at 25:13-15; Ex. 13.

55.    3M SEFMT [

] Steinke Dep. at 25:15-26:13; Ex. 13.

56.    3M Company has disseminated marketing brochures describing its SEFMT products.

Steinke Dep. at 85:13-24, 103:6-19; Ex. 13.

57.    3M employs numerous sales representatives to market products, including foam masking

tape, to auto body shops. Steinke Dep. at 115:2-116:23; Ex. 13.

57A.   Distributor sales of 3M SEFMT exceeded [          ] dollars in 2004. ADD Distributor

Sales of Soft-Edge Foam Tape *Sales Dollars & Units for 2001-2005*, Bates nos.

3M021260 and 3M021311, attached as Ex. 29.

58.    3M manufactures foam masking tape, under Model Nos. 06296, 06297 and 06298, [     ]

[                                    ]. Complainants' Responses to Commission Investigative Staff's First Set of Interrogatories (Nos. 1-30), Response to Interrogatory No. 15; Ex. 14.

59.     Intertape Polymer Corp. National Sales Manager, Automotive Aftermarket, testified at deposition as follows concerning use of 3M SEFMT:

[

]

Nicolosi Dep. at 69:24-70:3 (Ex. 10).

60.     Complainants' experts timely filed expert reports in support of, *inter alia,* the existence of a domestic industry with respect to the practice of the '097 patent. *See* Colton Initial Report (Ex. 8); Siewert's Report (Ex. 9). *See also* Colton Decl. ¶ 9; Ex. 8.

61.     The expert report filed on behalf of Jevtec by David L. McNeight, after the date set in the Procedural Schedule, does not address Complainants' practice of the '097 patent. *See* Opening Expert Report of David L. McNeight on Behalf of Respondents [sic] Jevtec Ltd. ("McNeight Expert Report"), served on May 6, 2005; Ex. 6.

62.     Use of the foam masking tape distributed and sold by 3M under the name SEFMT (Model Nos. 06296, 06297 and 06298) in the manner taught by the text and illustrations found on the exterior of the box in which it is sold would practice claims 1, 4, 7, 8, 10, 13, 14 and 16 of the '097 patent. Colton Decl. ¶ 3; Ex. 8.

63.     3M SEFMT is not a staple article of commerce having utility apart from the method of claims 1, 4, 7, 8, 10, 13, 14 and 16 of the '097 patent. Colton Decl. ¶ 8; Ex. 8.

64.     The box in which 3M SEFMT is packaged bears photos and diagrams that depict masking a portion of the surface of an automobile and instructions teaching same. Colton Initial

-33-

Report at 17; Ex. 8.

65. The diagrams, photos and instructions accompanying 3M SEFMT packaging teach application of the foam tape to a part of an automobile. Colton Initial Report at 17-18; Ex. 8.

66. Those of skill in the art use foam masking tape distributed and sold by 3M under the name SEFMT in the manner taught by the text and illustrations found on the exterior of the box in which it is sold. Siewert Decl. ¶ 3; Ex. 9.

67. There is no substantial use for 3M SEFMT other than to mask the gaps in automobiles prior to painting. Siewert Decl. ¶ 5; Ex. 9.

68. Autobody technicians use the 3M foam masking tapes so as to mask the gaps in automobiles prior to painting. Siewert's Report; *see* Ex. 9.

69. An autobody technician of ordinary skill would apply 3M's SEFMT to a portion of the car so as to fill a gap in the surface of the automobile and prevent unwanted entry of paint into the gap. *Id.; see* Ex. 9.

70. Mr. Siewert has both used and observed the use of 3M's SEFMT, by technicians of ordinary skill, to mask gaps of an automobile prior to painting. *Id; see* Ex. 9.

71. [Number not used.]

72. Gino J. Bauwens is the Owner and Chief Financial Officer for Chemicar USA, Inc. ("Chemicar"). Declaration of Gino J. Bauwens in Support of Respondent Chemicar USA, Inc.'s Settlement Agreement ("Bauwens Decl.") ¶ 1; Ex. 15.

73. Chemicar is a Tennessee corporation having its principal place of business at 670 New York Street, Memphis, Tennessee 38104. Chemicar is in the business of importing and selling

automotive aftermarket products including foam masking tape.  Bauwens Decl. ¶ 2; Ex. 15.

74.     Chemicar has sold its accused foam masking tape products as [

].

Chemicar also sold some foam in blank boxes under the same item numbers.  Bauwens Decl.

¶ 5(a); Ex. 15.

75.     Chemicar's manufacturer/supplier of the accused products was [                    ],

located in [                ].  Bauwens Decl. ¶ 5(b); Ex. 15.

76.     Chemicar's first order of the accused products was received in Chemicar's warehouse in

[                ] on or about [                    ].  Bauwens Decl. ¶ 5(c); Ex. 15.

77.     Chemicar has imported the following accused products into the United States in [

]:

| Shipment No. | Date | Model Type | No. of Boxes | Value |
|---|---|---|---|---|
| [   ] | [        ] | [       ] | [     ] | [       ] |
|       |          | [       ] | [     ] | [       ] |
| [   ] | [        ] | [       ] | [     ] | [       ] |
|       |          | [       ] | [     ] | [       ] |
| [   ] | [ 1      ] | [       ] | [     ] | [       ] |
| [   ] | [        ] | [       ] | [     ] | [       ] |
| [   ] | [        ] | [       ] | [ 1   ] | [       ] |
| TOTAL |          |           | [     ] | [      ]. |

Bauwens Decl. ¶ 5(d); Ex. 15.

78.  Chemicar has sold the following accused products in the United States:

| Model Type | No. of Boxes | Value |
|------------|--------------|-------|
| [          ] | [          ] | [          ] |
| [          ] | [          ] | [          ]. |

Bauwens Decl. ¶ 5(e); Ex. 15.

79.  The ports of entry for Chemicar's accused products were [

]. Bauwens Decl. ¶ 5(f); Ex. 15.

80.  The Harmonized Tariff Schedule of the United States number(s) under which the accused

products were imported into the United States are as follows:

[                                        ]
[                                        ]
[                                        ].

Bauwens Decl. ¶ 5(g); Ex. 15.

81.  Benoit Bazin is Vice President of Saint-Gobain Abrasives, Inc. ("Saint-Gobain Abrasives").

Declaration of Benoit Bazin ("Bazin Decl.") ¶ 1; Ex. 16.

82.  Since at least [                    ], Saint-Gobain Abrasives has imported into the United

States and/or sold for importation into the United States foam masking tape under the brand

name Normag™ Foam Masking Tape, Model No. 63642505665.  Bazin Decl. ¶ 2; Ex. 16.

83.  Saint-Gobain Abrasives has imported into the United States [          ] rolls of Normag™

Foam Masking Tape valued at  [          ]. A schedule of Saint-Gobain Abrasives' U.S.

imports of Normag™ Foam Masking Tape is attached to the Declaration of Benoit Bazin as

Exhibit A.  Bazin Decl. ¶ 3; Ex. 16.

84.  Saint-Gobain Abrasives has sold after importation into the United States [          ] rolls of

Normag™ Foam Masking Tape for  [                    ]. A schedule of Saint-Gobain Abrasives'

-36-

U.S. sales of Normag™ Foam Masking Tape is attached to the Declaration of Benoit Bazin as Exhibit B. Bazin Decl. ¶ 4; Ex. 16.

85.    Saint-Gobain Abrasives purchased its Normag™ Foam Masking Tape from [

]. Bazin Decl. ¶ 6; Ex. 16.

86.    True and correct copies of invoices documenting Saint-Gobain Abrasives' purchase of Normag™ Foam Masking Tape [                    ] are attached to the Declaration of Benoit Bazin as Exhibit C. Bazin Decl. ¶ 7; Ex. 16.

87.    The Harmonized Tariff Schedule of the United States number(s) under which the Normag™ Foam Masking Tape was imported into the United States is [                ]. Bazin Decl. ¶ 8; Ex. 16.

88.    The port entry for the Normag™ Foam Masking Tape was [                ]. Bazin Decl. ¶ 9; Ex. 16.

89.    Peter M. Stein is the Vice-President of Indasa U.S.A., Inc. ("Indasa U.S.A."). Indasa U.S.A. is a wholly owned subsidiary of Indasa, S.A. ("Indasa, S.A."). Declaration of Peter M. Stein ("Stein Decl.") ¶ 1; Ex. 17.

90.    Indasa U.S.A. is a Delaware corporation, with a place of business at 9 Falstrom Court, Passaic, New Jersey 07055, that distributes and sells commercial and consumer abrasives and other products. Stein Decl. ¶ 2; Ex. 17.

91.    Indasa, S.A. is a corporation organized under the laws of Portugal with its principal place of business located at Zona Industrial de Aveiro, Lote 46, P.O. Box 3005, 3801-903, Aveiro, Portugal. Indasa, S.A. manufactures, distributes and sells commercial and consumer abrasives and other products. Stein Decl. ¶ 3; Ex. 17.

-37-

92.    The model numbers of Indasa's accused foam masking tape are [

       ]. Stein Decl. ¶ 5; Ex. 17.

93.    [

              ] is the manufacturer and supplier of the accused foam masking tape for

Indasa U.S.A.  Stein Decl. ¶ 6; Ex. 17.

94.    Attached as Exhibit A to the Declaration of Peter M. Stein are the two invoices Indasa

       U.S.A. received for the accused foam masking tape: [

                                                          ]. Stein Decl. ¶ 7; Ex.

17.

95.    Indasa U.S.A. received a total of [            ] of the accused foam masking tape in the

       United States. The [

                                        ]. Stein Decl. ¶ 8; Ex. 17.

96.    Indasa U.S.A. imported a total of [            ], into the United States, of the accused foam

       masking tape at a total purchase price of  [            ]. Stein Decl. ¶ 9; Ex. 17.

97.    Indasa U.S.A. sold [            ], in the United States, of the accused foam masking tape

       for an approximate total sales price of  [            ].  The sales were completed from

       [                                ]. Stein Decl. ¶ 10; Ex. 17.

98.    Attached as Exhibit B to the Declaration of Peter M. Stein are five sample invoices sent by

       Indasa U.S.A. to various retail customers.  Stein Decl. ¶ 11; Ex. 17.

99.    The only known port of entry of Indasa's accused foam masking tape, which was designated

       to be shipped to Indasa U.S.A., is [                    ]. Stein Decl. ¶ 12; Ex. 17.

100.    The numbers in the Harmonized Tariff Schedule of the United States under which Indasa's

        accused foam masking tape was imported into the United States are [                    ].

        Stein Decl. ¶ 13; Ex. 17.

101.    William C. Ruffini is Assistant Vice-President of Transtar Autobody Technologies, Inc.

        ("Transtar").  Declaration of William C. Ruffini ("Ruffini Decl.") ¶ 1; Ex. 18.

102.    The Transtar part numbers for the accused products are as follows:

                      [                                        ]

                      [                                        ].

        Ruffini Decl. ¶ 2; Ex. 18.

103.    Transtar's accused products are produced by:

                      [


                                   ].

        Ruffini Decl. ¶ 3; Ex. 18.

104.    Transtar purchases the accused products through an export agent:

                      [


                              ].

        Ruffini Decl. ¶ 3; Ex. 18.

105.    Transtar received an initial shipment of the accused products on [                    ].  A copy of

        the invoice is attached to the Declaration of William C. Ruffini as Exhibit A.  Ruffini Decl.

        ¶ 4; Ex. 18.

106.    Set forth below is a listing of all receipts by Transtar in the United States of the accused

products:

[

Boxes

————

TOTAL =                                    ]

[

Boxes

————

TOTAL =                                    ].

Ruffini Decl. ¶ 5; Ex. 18.

107.    Transtar's U.S. sales of the accused products are as follows:

[                          ]

Boxes          Dollars

[

————          ————

TOTAL =                                    ]

[                          ]

Boxes          Dollars

[

————          ————

TOTAL =                    $        ].

Ruffini Decl. ¶ 6; Ex. 18.

-40-

108.    The port of entry for all [        ] shipments of the accused Transtar products was [

        ]. Ruffini Decl. ¶ 7; Ex. 18.

109.    The Harmonized Tariff Schedule Number for the accused Transtar products is [

        ]. Ruffini Decl. ¶ 8; Ex. 18.

110.    Shirley Chen is Marketing Manager of Continental Marketing International ("CMI").

        Declaration of Shirley Chen ("Chen Decl.") ¶ 1; Ex. 19.

111.    The CMI part numbers for CMI's accused products are as follows:

        [

                                                                                        ].

        Chen Decl. ¶ 2; Ex. 19.

112.    CMI's accused products are produced by:

        [

                                                ].

        Chen Decl. ¶ 3; Ex. 19.

113.    CMI purchased the accused products from [                        ] Chen Decl. ¶ 3; Ex.

        19.

114.    CMI received an initial shipment of the accused products on [                ]. Copies of

        invoices are attached to the Declaration of Shirley Chen as Exhibit A.  Chen Decl. ¶ 4; Ex.

        19.

115.   A listing of all receipts of the accused products by CMI from [                          ] is

as follows:

[                                    ]

[                          Boxes


TOTAL =          _____          ]

[                                    )]

[                          Boxes


TOTAL =          _____          ].

Chen Decl. ¶ 5; Ex. 19.

116.   CMI's U.S. sales of the accused products were only to [

] and the sales are as follows:

[                                    ]

[                Boxes                Dollars

TOTAL =      _____          _____          ]

[                                    ]

[                Boxes                Dollars

[

TOTAL =      _____          _____          ].

Chen Decl. ¶ 6; Ex. 19.

117.   The port of entry for all [          ] shipments of CMI's accused products was [

      ]. Chen Decl. ¶ 7; Ex. 19.

118.   The Harmonized Tariff Schedule Number for CMI's accused products is [

      ]. Chen Decl. ¶ 8, Ex. 19.

119.   Henk Klein Wassink is the Financial Director for E.M.M. International B.V. ("E.M.M.

      International").  Declaration of Henk Klein Wassink ("Wassink Decl.") ¶ 1; Ex. 20.

120.   Since at least [               ] E.M.M. International imported into the United States and/or

      sold for importation into the United States under the brand name Colad® Foam Masking

      Tape (13mm) – Article #908013 and Colad® Foam Masking Tape (19mm) – Article

      #908019.  Wassink Decl. ¶ 2; Ex. 20.

121.   All of the Colad® Foam Masking Tape [


      ]. Wassink Decl. ¶ 3; Ex. 20.

122.   The value of the Colad® Foam Masking Tape E.M.M. International imported into the United

      States and/or sold for importation into the United States is as follows:

                    **PRODUCT**                         **VALUE**

           [



                                   ].

      Wassink Decl. ¶ 4; Ex. 20.

123.   E.M.M. International has accepted the return of [

-43-

].

Wassink Decl. ¶ 5; Ex. 20.

124.    E.M.M. International purchases its Colad® Foam Masking Tape from [

        ]. Wassink Decl. ¶ 6; Ex. 20.

125.    Klaus W. Voss is the president of Vosschemie GmbH ("Vosschemie").    Declaration of

        Vosschemie GmbH ("Voss Decl.") ¶ 1; Ex. 21.

126.    Vosschemie has engaged in only [        ] shipment into the United States of foam masking

        tape that is the subject of the present investigation.    Specifically, [

                                                                            ]. A

        copy of the invoice is attached to the Declaration of Vosschemie GmbH.    Voss Decl. ¶ 2; Ex.

        21.

127.    Lee Freeman is the President and Chief Executive Officer of EMM America, Inc. ("EMM

        America").    Declaration of Lee Freeman ("Freeman Decl.") ¶ 1; Ex. 22.

128.    Since at least [

                                                                ].    Freeman Decl. ¶ 2; Ex. 22.

129.    EMM America has imported into the United States [

                                        -44-

]. Freeman Decl. ¶ 3; Ex. 22.

130.  EMM America purchases its [                                              ].
Freeman Decl. ¶ 4; Ex. 22.

131.  True and correct copies of invoices documenting [

] are attached to the Declaration of Lee

Freeman to as Exhibit A.  Freeman Decl. ¶ 5; Ex. 22.

132.  A true and correct copy of a Schedule of EMM America's importations of [

] is attached to the Declaration of Lee Freeman as Exhibit B.  Freeman Decl.

¶ 6; Ex. 22.

133.  The port of entry into the United States for EMM America's [                  ]

is [                                           ]. Freeman Decl. ¶ 7; Ex. 22.

134.  EMM America's [                              ] is imported into the United States under the

Harmonized Tariff Schedule of the United States number [                  ]. Freeman Decl. ¶ 8;

Ex. 22.

135.  EMM America has sold in the United States after importation [

]. Freeman Decl. ¶ 9; Ex. 22.

136.  A true and correct copy of a document entitled [

] setting forth EMM America's sales of [

] is attached the Declaration of Lee Freeman as Exhibit C.  Freeman Decl. ¶ 10; Ex. 22.

137.    EMM America currently maintains a U.S. inventory of [

]. This inventory includes product returned or called back as a result of the investigation.  Freeman Decl. ¶ 11; Ex. 22.

138.    A true and correct copy of a summary of the status and disposition of EMM America's U.S. inventory of [                              ] is attached to the Freeman Declaration as Exhibit D.  Freeman Decl. ¶ 12; Ex. 22.

139.    Boss Auto Import, S.A. ("Boss Auto") is a manufacturer of accused foam masking tape. Response of Respondent Boss Auto Import, S.A. to Complainant 3M's First Set of Interrogatories ("Boss Auto's Response"), Response to 3M Interrogatory No. 3; Ex. 24; Ex. 24.

140.    The first sale of Boss Auto's accused foam masking tape was to [
]. Boss Auto's Response to 3M Interrogatory No. 6; Ex. 24.

141.    The port of entry for Boss Auto's accused foam masking tape is [                    ]. Boss Auto's Response to 3M Interrogatory No. 8; Ex. 24.

142.    Boss Auto's accused foam masking tape was imported into the United States under the Harmonized Tariff Schedule of the United States number [                ]. Boss Auto's Response to 3M Interrogatory No. 9; Ex. 24.

143.    Until [              ], the accused foam masking tape imported and sold by the Intertape Respondents was manufactured by [                              ]. Intertape Respondents'

Response to 3M Interrogatory No. 23; Ex. 23.

144.    Beginning in [                    ], the Intertape Respondents' accused foam masking

tape has been manufactured by [                    ] Intertape Respondents' Response

to 3M Interrogatory No. 23; Ex. 23.

145.    Jevtec manufactures its accused foam masking tape in [                    ] Jevtec's

Response to 3M Interrogatory No. 1; Ex. 4.

146.    Jevtec sells its accused foam masking tape to [                    ] for

subsequent resale.  Jevtec's Response to 3M Interrogatory No. 1; Ex. 4.

147.    Intertape Polymer Corp. is a Delaware corporation having its principal place of business

located at 3647 Cortez Road West, Bradenton, Florida 34210.  *See* Second Amended

Complaint ¶ 12; Response of Respondents Intertape Polymer Corp., IPG Administrative

Services Inc. and Intertape Polymer Group Inc. to the Amended Complaint and the Notice

of Investigation ¶ 12.

148.    IPG Administrative Services, Inc. is a Delaware corporation having its principal place of

business located at 3647 Cortez Road West, Bradenton, Florida 34210.  See Second

Amended Complaint ¶ 12A; Response of Respondents Intertape Polymer Corp., IPG

Administrative Services Inc. and Intertape Polymer Group Inc. to the Amended Complaint

and the Notice of Investigation ¶ 12A.

149.    Intertape Polymer Group, Inc. is a corporation organized under the laws of Canada with its

principal place of business located at 110 E. Montee de Liesse, Montreal, Quebec, Canada

H4T 1N4.  See Second Amended Complaint ¶ 11; Response of Respondents Intertape

Polymer Corp., IPG Administrative Services Inc. and Intertape Polymer Group Inc. to the Amended Complaint and the Notice of Investigation ¶ 11.

150.  The Intertape Respondents' first delivered the accused DM-37 ShieldFast™ foam masking tape [                    ]. Intertape Respondents' Response to 3M Interrogatory No. 4(d).

151.  The Intertape Respondents have imported and sold, through December 31, 2004, approximately [              ] of DM-37 ShieldFast™ foam masking tape.  Intertape Respondents' Response to 3M Interrogatory No. 4(e); Ex. 23.

152.  The ports of entry for the Intertape Respondents' DM-37 ShieldFast™ foam masking tape are [                        ]. Intertape Respondents' Response to 3M Interrogatory No. 8; Ex. 23.

153.  The Harmonized Tariff Schedule of the United States numbers under which the Intertape Respondents' DM-37 ShieldFast™ foam masking tape are imported into the United States are [           ]. Intertape Respondents' Response to 3M Interrogatory No. 9; Ex. 23.

154.  The import price of the Intertape Respondents' DM-37 ShieldFast™ foam masking tape is [       ]. See Ex. 5 at IP 00745.

155.  For the year 2000, the Intertape Respondents' total U.S. sales of DM-37 ShieldFast™ foam masking tape was [           ]. See Ex. 5 at IP 01670-1675.

156.  For the year 2001, the Intertape Respondents' total U.S. sales of DM-37 ShieldFast™ foam masking tape was [           ]. See Ex. 5 at IP 01529-1531.

157.  For the year 2002, the Intertape Respondents' total U.S. sales of DM-37 ShieldFast™ foam masking tape was [           ]. See Ex. 5 at IP 01219-1224.

158.   For the year 2003, the Intertape Respondents' total U.S. sales of DM-37 ShieldFast™ foam masking tape was   [                ].  *See* Ex. 5 at IP 00979-983.

159.   For the year 2004, the Intertape Respondents' total U.S. sales of DM-37 ShieldFast™ foam masking tape was   [                ].  *See* Ex. 5 at IP 00841-843.

160.   For the year 2005 (YTD), the Intertape Respondents' total U.S. sales of DM-37 ShieldFast™ foam masking tape was   [                ].  *See* Ex. 5 at IP 00761-762.

161.   From the year 2002 to 2005 (YTD), the Intertape Respondents' total U.S. sales of DM-37 ShieldFast™ foam masking tape was   [                ].  *See* Ex. 5 at IP 00761-762, IP 00841-843, IP 00979-983, IP 01219-1224, IP 01529-1531, IP 01670-1675.

162.   The following chart summarizes the known amount of imports, import values and sales of the accused product by the named domestic respondents:

| Respondent | Quantity Imported | Import Value | U.S. Sales |
|---|---|---|---|
| [      ] | [      ] | [      ] | [      ] |
| [      ] | [      ] | [      ] | [      ] |
| [      ] | [      ] | [      ] | [      ] |
| [      ] | [      ] | [      ] | [      ] |
| [      ] | [      ] | [      ] | [      ] |

-49-

| Respondent | Quantity Imported | Import Value | U.S. Sales |
|---|---|---|---|
| [                    ] | [          ] | [        ] | [          ] |
| Total | [        ] | [        ] | [          ] |

**Source**:  Statement of Material Facts ¶¶ 77, 78, 83, 84, 94, 96, 97, 106, 107, 129,135, 151 and 154-159; Exs. 5, 15-18, 22.

163.   All respondents' imports of foam masking tape were accused of infringing the '097 patent.

*See* Second Amended Complaint.

**X.**    **Conclusion**

Accordingly, based on the foregoing, the motion [528-040] for summary determination is hereby granted. Complainants have established that Respondent Jevtec imported and sold for importation the accused foam masking tape and infringement of the '097 patent by Respondent Jevtec. Complainants have also established a domestic industry. Complainants have therefore established a violation of section 337. The undersigned recommends the issuance of a general exclusion order and a bond of 100% of the entered value of the infringing goods.

Pursuant to 19 C.F.R. § 210.42(h), this Initial Determination shall become the determination of the Commission unless a party files a petition for review pursuant to 19 C.F.R. § 210.43(a) or the Commission, pursuant to 19 C.F.R. § 210.44, orders on its own motion a review of the Initial Determination or certain issues therein.

Within seven days of the date of this document, each party shall submit to the Office of the Administrative Law Judges a statement as to whether or not it seeks to have any portion of this document deleted from the public version. The parties' submissions may be made by facsimile and/or hard copy by the aforementioned date.

Any party seeking to have any portion of this document deleted from the public version thereof must submit to this office a copy of this document with red brackets indicating any portion asserted to contain confidential business information. The parties' submissions concerning the public version of this document need not be filed with the Commission Secretary.

**SO ORDERED.**

Charles E. Bullock
Administrative Law Judge

-51-

**IN THE MATTER OF CERTAIN FOAM MASKING TAPE**          337-TA-528

<u>CERTIFICATE OF SERVICE</u>

I, Marilyn R. Abbott, hereby certify that the attached **ORDER** was served upon, Steven R. Pedersen, Esq., Commission Investigative Attorney, and the following parties via first class mail and air mail where necessary on ___June 29_____, 2005.

Marilyn R. Abbott, Secretary
U.S. International Trade Commission
500 E Street, S.W., Room 112A
Washington, D.C. 20436

**FOR COMPLAINANTS 3M COMPANY, 3M INNOVATIVE PROPERTIES COMPANY:**

Tom M. Schaumberg, Esq.
Louis S. Mastriani, Esq.
Sarah E. Hamblin, Esq.
Michael G. McManus, Esq.
Michael L. Doane, Esq.
S. Alex Lasher, Esq.
**ADDUCI, MASTRIANI & SCHAUMBERG, L.L.P.**
1200 Seventh Street, N.W.
Washington, D.C. 20036

Jonathan E. Singer, Esq.
**FISH & RICHARDSON P.C., P.A.**
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, Minnesota 55402

Hildy Bowbeer
John A. Burtis
**3M COMPANY**
**OFFICE OF INTELLECTUAL PROPERTY COUNSEL**
3M Center
P.O. Box 33427
St. Paul, Minnesota 55133

**IN THE MATTER OF CERTAIN FOAM MASKING TAPE**          337-TA-528

**FOR RESPONDENT JEVTEC LIMITED**

Jevtec Limited
Unit 3, Cranage Trading Park
Goostrey Lane
Holmes Chapel
Cheshire CW4 8HE
United Kingdom

David L. McNeight
Brow Top
Lees Lane
Wilmslow
Cheshire SK9 2LR
England

## PUBLIC MAILING LIST

Donna Wirt
LEXIS - NEXIS
1150 18th Street, N.W.
Suite 600
Washington, D.C. 20036

Ronnita Green
West Group
Suite 230
901 Fifteenth Street, N.W.
Washington, D.C. 20005